UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MOUSEN ADEN,

    Plaintiff,

v.

DR. RYAN HERRINGTON, et al.,

    Defendants.

Case No. 1:12-cv-86

Spiegel, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff, proceeding *pro se* and currently incarcerated at the Hardeman County Correctional Facility in Whiteville, Tennessee, initiated this lawsuit on January 30, 2012, while incarcerated at the Warren Correctional Institution ("WCI") in Lebanon, Ohio. Pursuant to local practice, the case has been referred to the undersigned magistrate judge for initial review and a report and recommendation ("R&R") on any dispositive motions. Presently pending are Plaintiff's motion for summary judgment, and Defendants' cross-motion for summary judgment. (Docs. 46, 54). Also pending are Plaintiff's motion to be transported to this district for further proceedings, and motion for jury trial, as well as a construed motion to amend his complaint. (Docs. 43, 51, 55). For the reasons that follow, Defendants' motion for summary judgment should be granted and Plaintiff's motion for summary judgment should be denied. All other motions should be denied as moot.

**I. Factual and Procedural Background**

The following factual background is derived from Plaintiff's complaint, and from evidence filed of record as exhibits to the parties' cross-motions for summary judgment.

Any disputed issues of fact have been construed in favor of the Plaintiff.

On March 8, 2012, the undersigned reviewed Plaintiff's initial complaint against the five named Defendants, all of whom were sued in their individual capacities, under the screening standards of 28 U.S.C. §§1915(e) and 1915A.  All of Plaintiff's claims arose out of an injury Plaintiff sustained to his ankle while playing soccer on Tuesday evening, July 5, 2011.

Defendant Nurse Ronald Arnett responded to the recreational fields and rendered first aid at approximately 8:30 p.m.  Shortly thereafter, Plaintiff was transported to the WCI infirmary, where he arrived at approximately 8:55 p.m.  Plaintiff advised Arnett that he believed that his ankle was broken, but Arnett allegedly responded by opining that it was only a sprain.[1]  According to Plaintiff, Arnett provided him with four ibuprofen tablets and, with Defendant Nurse Steve Sassaman's assistance,[2] applied a cast to the injured area.  (Doc. 1 at 2).

Plaintiff's complaint alleges that Defendant Sassaman told him that "under any other circumstance, Plaintiff would have been sent to the emergency room for an immediate x-ray."  (*Id.* at ¶7).  However, Sassaman stated that he lacked authority to order an emergency x-ray and failed to contact anyone with authority to obtain that authorization.  (*Id.*).

Defendants have offered unrebutted evidence that at the time of Plaintiff's injury, there were no physicians, nurse practitioners, or physician assistants on duty at WCI.  Ohio Department of Rehabilitation and Correction ("ODRC") policy authorizes on-duty

---

[1]Defendant Arnett denies making any actual diagnosis concerning whether the injury was a fracture or sprain.
[2]Plaintiff's complaint misspells Defendant's Arnett's surname as "Arnette," and Defendant Sassaman's surname as "Sassmen."  The Court has used the correct spellings in this Report and Recommendation.

nursing personnel to decide, when no physician or advanced level provider is on duty, whether to initiate contact with the on-call physician or advanced level provider to obtain their authorization if urgent medical intervention is needed through transportation to a local hospital emergency department. If the medical emergency presents insufficient time to obtain prior approval of the on-call physician or advanced level provider, the attending nurse(s) may independently authorize emergency medical transport, but must provide timely follow-up notice to the on-call physician or advanced level provider and to the Health Care Administrator. (Doc. 54-6 at 3, ODRC Policy No. 68-MED-20).

The ODRC policy narrowly defines "Medical Emergency" as "[s]erious life threatening or disabling condition(s) manifested by severe symptoms that would result in serious physical impairment or loss of life if not treated immediately." (*Id.*). Defendants represent that soft tissue injuries, or cases of suspected uncomplicated fractures where there is no circulatory compromise, extreme or severe swelling, internal bleeding, or unexplained severe or intractable pain, do not fall within the policy definition of a "Medical Emergency."

Defendants Arnett and Sassaman have filed affidavits explaining that their examination of Plaintiff's ankle on the evening of July 5 revealed no breach of skin, no obvious or gross deformity, discoloration or displacement. (Doc. 54-2 at ¶6; Doc. 54-4 at ¶6). The ankle was swollen and Plaintiff could not bear weight on it. However, there was no circulatory compromise and, while in pain, Plaintiff denied that his pain was unmanageable or intractable. (*Id.*). Based upon their examination, Defendants Arnett and Sassaman provided ibuprofen for pain, elevation and ice to reduce and contain swelling, and a temporary cast, as well as crutches and a medical restriction for a

low-bunk.  Because neither Arnett nor Sassaman concluded that Plaintiff's injury at that time constituted a "medical emergency" as defined by ODRC policy, they did not contact the on-call physician or request immediate transport of Plaintiff to the Middletown Atrium Hospital Emergency Department.  Defendants' affidavits state that they further decided not to seek transport of Plaintiff to the Franklin Medical Center's Urgent Care Unit for immediate x-rays, because Plaintiff did not arrive at the prison infirmary until nearly 9 p.m., and the Urgent Care Unit closes each day at 10:00 p.m.  (*Id.* at ¶¶8-9).  In addition to their belief that the situation did not constitute a medical emergency, Sassaman and Arnett believed that there was not sufficient time to arrange for a transportation detail and have Plaintiff transported for x-rays before the local urgent care center would close.  Instead, Plaintiff was released to his housing unit and scheduled to return to see the physician for the first appointment the following morning.

When Plaintiff returned to Health Services at 10:00 a.m. on July 6, 2011, he saw Dr. Ryan Herrington, Chief Medical Officer at WCI, and Nurse Jim McNally, both of whom were named as additional defendants in Plaintiff's complaint.  Plaintiff's temporary cast was re-applied, and Dr. Herrington ordered x-rays for the next available date when a visiting x-ray technician was scheduled to be at WCI, which was Friday, July 8, 2011. Plaintiff indicated that he could no longer walk on crutches and thereafter was admitted in-patient to the Infirmary unit, where he remained under Dr. Herrington's care until at least July 14, 2011.

The July 8 x-rays confirmed that Plaintiff's ankle was broken.  Plaintiff alleges that the following day, Saturday, July 9, 2011, he observed a Caucasian inmate (hereinafter identified as "W.H.") arrive at Health Services with a swollen hand.  Although Plaintiff

alleges that W.H. also was treated by Defendant Sassaman,[3] Defendants have submitted evidence that W.H. presented to the infirmary at 1:25 p.m., and was examined and treated by Nurse Practitioner Brenda Tilton, an advanced level provider who is authorized to issue orders for treatment and/or x-rays. (Doc. 54-2 at 4, ¶12; Doc. 54-4 at 4-5, ¶12-13; Doc. 54-5 at 2, ¶6). Neither Sassaman nor Arnett were involved with treatment provided to W.H. (*Id.*). Additional evidence reflects that W.H. suffered the injury to his hand the prior evening, on July 8, but did not receive medical attention until he arrived at the infirmary approximately twelve hours later. Nurse Tilton sent W.H. out for x-rays to the Franklin Medical Center's Urgent Care later that same day. Plaintiff, who identifies himself as a black Somali immigrant, alleges in his complaint that he asked why W.H. was able to receive an "emergency" x-ray. Nurse McNally allegedly responded: "It's a White thing." (Doc. 6 at 2, ¶9).

Plaintiff was referred to an orthopedic specialist for consultation on July 14, 2011,[4] and ultimately underwent surgery on his ankle on August 8, 2011, approximately five weeks following his initial injury. After the date of July 14, 2011, Plaintiff makes no further complaint about the treatment of his ankle injury. Plaintiff fully exhausted his administrative remedies prior to filing suit in this Court, by filing an informal complaint resolution, a notification of grievance, and an appeal to the Chief Inspector. During the administrative process, McNally was interviewed concerning Plaintiff's allegation that he told Plaintiff that the decision not to send Plaintiff for immediate x-rays was "a White

---

[3] In Plaintiff's motion for summary judgment, he argues that Sassaman was the "only nurse shown to be on shift" on the date of July 9, 2011, according to Defendants' responses to Plaintiff's written discovery requests. (Doc. 46 at 5). However, examination of those responses do not support Plaintiff's argument, as the referenced documents instead merely consist of a progress note authored by Sassaman concerning Plaintiff's medical status on July 9, 2011. (See Doc. 46-2 at 28-29).
[4] It appears that Plaintiff's ankle was x-rayed further in the course of treatment by the orthopedist.

thing." McNally expressly denied making any such statement then, and in the course of this litigation. His affidavit states that it was Plaintiff who brought up the issue of race, ethnicity, and/or national origin when he complained to McNally that W.H. was being given preferential treatment. McNally states that Plaintiff did not ask a neutral, open-ended question but instead raised the issue in an accusatory manner to which McNally initially declined to respond. After repeated questions from Plaintiff, McNally finally responded that he (McNally) had no information about the care and treatment that Plaintiff received, or that W.H. was receiving, as he was not involved in the initial care or treatment of either inmate. However, when Plaintiff persisted in his statements that he was being discriminated against because of his race, McNally eventually responded, "You can believe whatever you want to believe," or words to that effect. (Doc. 54-5).

Consistent with his complaints at the administrative level, Plaintiff's complaint in this Court primarily alleged that five medical personnel at WCI acted with deliberate indifference to his serious medical needs, based upon the alleged failure to provide adequate pain relief up until July 14, and the delay in being sent for x-rays. Plaintiff further alleged that Defendants provided "discriminatory treatment on the basis of race." (Doc. 1 at 2). With respect to the Eighth Amendment violation, the undersigned concluded that on initial screening Plaintiff's allegations failed to state any claim against any of the named Defendants, because his allegations "[a]t most…may give rise to a claim of negligence on the part of defendants Arnett and Sassaman, who treated plaintiff on the day he was injured." (Doc. 7 at 6).

By contrast, the undersigned concluded that Plaintiff's race discrimination claim, construed as brought under the Fourteenth Amendment's Equal Protection Clause, was

-6-

sufficiently articulated to proceed beyond the screening level against two of the five defendants.

> Plaintiff's allegations arguably implicate equal protection concerns to the extent he has alleged that he is African-American, that another white inmate received an emergency x-ray three to four days later "under similar circumstances," and that he was told that "[i]t's a White thing" when he asked why he had not received the same treatment. However, only defendants Arnett and Sassaman were involved in the alleged discriminatory conduct that took place on the day plaintiff was injured.

(Doc. 7 at 7-8). Therefore, the undersigned recommended that summons issue only on Plaintiff's Equal Protection Clause claim, and only as to Defendant Nurses Arnett and Sassaman. On May 15, 2012, the presiding district judge adopted and affirmed the undersigned's R&R (Doc. 16), but subsequently vacated that order and granted Plaintiff additional time in which to file objections. (Doc. 33).

On November 20, 2012, the Court overruled Plaintiff's objections and again adopted the R&R in full. (Doc. 38). In so doing, the Court reasoned that even if Plaintiff were permitted to amend his complaint to include additional allegations stated in his objections, the legal analysis would be the same. "The fact that Plaintiff's injured ankle was not immediately attended to by an orthopedic doctor, combined with the other facts alleged by Plaintiff, creates, at most, a plausible negligence claim," which is not actionable under 42 U.S.C. §1983. (Doc. 38 at 3).

The presiding district judge also addressed Plaintiff's objection to the undersigned's recommendation that three medical personnel be dismissed as not liable for any plausible Equal Protection Clause claim. Even though Nurse McNally was alleged to have made the "White thing" statement, the Court agreed that only the two nurses who initially examined Plaintiff and allegedly denied him a referral for an

emergency x-ray could be held liable, because only those two Defendants "would have made the decision not to seek emergency x-rays on the basis of race." (Doc. 38 at 5). "Defendant Herrington ordered the x-rays when he saw Plaintiff the day after Plaintiff's injury and …Defendant McNally assisted Defendant Herrington at that visit, so an inference that they delayed treatment because of Plaintiff's race is not plausible." (*Id.*).

In his original complaint, Plaintiff sought monetary damages in the amount of eighty thousand ($80,000.00) dollars against each Defendant, designated as nominal, compensatory, and punitive damages. (Doc. 1 at 3). On January 7, 2013, Plaintiff filed a "Notice" seeking amendment of his damages claim to the sum of twenty-five million ($25,000,000.00) dollars against both Defendants, jointly and severally. (Doc. 43). Defendants filed no response to that Notice. Because Plaintiff captioned that document as a "Notice" rather than as a "Motion," the Plaintiff's request to amend his complaint was not initially brought to the Court's attention. It is now properly construed as a pending motion.

**II. Analysis**

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must view the evidence and draw all reasonable inferences in favor of the party opposing summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

moving party has the burden of showing an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the opposing party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the opposing party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the opposing party. *Id*. at 252.

### B. Defendants' Motion

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference*."* *Rondingo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681-682 (6th Cir. 2011)(citing *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). In the prison context, a plaintiff must show that he was treated differently than other similarly situated prisoners. *See McCleskey v. Kemp. Supt. Ga. Diagnostic and Class. Center*, 481 U.S. 279, 292-293 (1987)(holding that proof of an equal protection violation depends upon context, requiring exceptionally clear proof before inferring that a discretionary decision in the criminal justice system demonstrates discriminatory intent). To prevail on a §1983 claim for an equal protection violation on the basis of race, Plaintiff must show intentional discrimination because of membership in a particular class or group singled out for discriminatory treatment, not merely that he was treated unfairly from an individual perspective. *See Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990)(holding

that the fact that union members may have been disproportionately affected, standing alone, does not support a viable equal protection argument).

In terms of determining the type of violation of the Equal Protection Clause that Plaintiff is alleging, Defendants argue that Plaintiff cannot show that Defendants discriminated against him in such a manner as to burden "a fundamental right," because this Court has already determined that Plaintiff's allegations are insufficient to show that his Eighth Amendment rights were actually violated, or that the care he received amounted to deliberate indifference to his serious medical need. Of course, *Rondigo* does not hold that the fundamental right must be *violated*, but only "burdened." Regardless of whether the distinction has any legal significance, however, the evidence submitted by Defendants, discussed below, entitles them to summary judgment on any claim that Plaintiff's fundamental right to medical care was burdened and/or violated.

Additionally, Plaintiff has not alleged, and has provided no evidence, that Defendants have targeted a suspect class (African-Americans or Somali immigrant prisoners) for disparate medical treatment, through any statute or ODRC policy or procedure. In fact, in his own motion for summary judgment, Plaintiff admits that he can no more than speculate that he was targeted as a part of a suspect class based on his status as a black Muslim Somali immigrant. "Plaintiff assumes this may be the reason he was targeted. . .." (Doc. 46 at 4). However, Plaintiff's status as a black Muslim Somoli immigrant does not constitutionalize daily medical decisions made on his behalf, so long as some medical care has been provided. *See Rowe v. Correctional Medical Servs., Inc.,* 2010 WL 3779561 at *8 (W.D. Mich. Aug. 18, 2010)(*quoting Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) for proposition that where a prisoner's dispute is over

the adequacy of medical treatment, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

The most obvious construction of Plaintiff's allegations, then, is that he is claiming an equal protection violation based upon a "class of one" theory.  Under a "class of one" theory of equal protection, Plaintiff must allege that W.H. "was similarly situated in all relevant respects," and that there is no rational basis for the difference in treatment. *Rondigo*, 641 F.3d at 682; *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)(per curiam).  In the prison context, a plaintiff must show that the treatment he received was different than the treatment given to other prisoners who were similarly situated in all relevant respects.  In the case presented, Defendants have offered evidence that conclusively demonstrates that Plaintiff and W.H. were not, in fact, similarly situated in all relevant respects. Given differences in the timing of their injuries and corresponding standard of care for treatment, Plaintiff cannot demonstrate that the differing amounts of time that occurred between the inmates' respective first visits to the infirmary and when x-rays were ordered was without a rational basis. For that reason alone, Defendants are entitled to judgment as a matter of law.

First, Plaintiff presented to the infirmary at approximately 9:00 p.m. on an evening when the local urgent care unit closed at 10:00 p.m., arguably resulting in an inadequate period of time in which to transport Plaintiff to the urgent care the same evening for x-rays. By contrast, W.H. presented to the infirmary at 1:25 p.m., arguably leaving ample time for transportation to a local urgent care unit for x-rays on the same day.

Second, Plaintiff was first seen by two nurses at a time when no physician or advanced level providers were on duty.  Pursuant to prison policy, nurses can order

transportation to an outside facility for a "Medical Emergency" (as defined by the same policy) only upon approval of a physician or advanced level provider. They can make that decision independently only if emergency conditions are such that advance approval is not permitted.   Plaintiff initially alleged that W.H. was similarly situated because he was also seen by Defendant Sassaman.   However, records submitted by Defendants prove that W.H. was examined by the advanced level provider then on duty, Nurse Practitioner Tilton.   Nurse Tilton could (and did) order transportation for x-rays on her own authority – not as a true "Medical emergency" under the referenced ODRC policy -- but instead in the ordinary course of treatment for W.H.'s injury.   When Plaintiff was first seen by a physician/advanced level provider on July 6, just over 12 hours after his injury, Dr. Herrington also ordered x-rays in the ordinary course of treatment for Plaintiff's injury.

The last distinction between the two patients concerns the conditions surrounding their initial visit to the infirmary.   Plaintiff was provided treatment immediately at the time of his injury, as Nurse Sassaman administered initial first aid at the recreational fields prior to transporting Plaintiff to the infirmary for further examination and treatment.   By contrast, W.H. did not seek treatment until approximately 12 hours after his hand injury. Because Plaintiff immediately received ice and other treatments designed to reduce swelling, and W.H. did not, it is likely that W.H.'s hand was more swollen, resulting in more difficulty in assessing the existence of circulatory compromise absent x-rays. These critical differences in circumstances are sufficient to show that Plaintiff and W.H. were not similarly situated in every relevant respect, and/or that there was a rational basis for any perceived differences in their initial assessments by different prison health care staff members.   Plaintiff simply cannot demonstrate that the disparate treatment he allegedly

-12-

received was "so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the [Defendants'] actions were irrational." *Rondingo*, 641 F.3d at 682 (citing *Warren v. City of Athens*, 411 F.3d 697, 710-711 (6th Cir. 2005)(quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000)).

Defendants are also entitled to summary judgment because Plaintiff cannot prove intentional discrimination by either Nurse Arnett or Nurse Sassaman. Even Plaintiff's complaint alleges only that Sassaman told him that the reason he was not being sent for an emergency x-ray was because Sassaman "[d]id not have the authority to send Plaintiff out…and he failed to contact the proper person(s) to obtain such authorization." (Doc. 6 at 2). Plaintiff alleged that Defendant Arnett, "without following protocol related to a broken ankle, that is, immediately consulting a doctor to see if an x-ray was required,…opined that Plaintiff only had an ankle sprain." (*Id.* at 1). In other words, Plaintiff's complaint attributes Arnett's conduct to his lack of authority, and Sassaman's conduct to medical negligence. Plaintiff does not allege that either Arnett or Sassaman acted in an intentional manner designed to discriminate against Plaintiff based upon his race, ethnicity, or national origin.

Moreover, even if Plaintiff had more clearly alleged intentional discrimination by Arnett and Sassaman in terms of their failure to contact a physician or advanced level provider to seek transport on the evening of July 5, the prison policy submitted by Defendants along with the medical evidence proves the likelihood that any such request would have been denied. Dr. Herrington assumed responsibility for all of Plaintiff's medical care beginning the morning of July 6. In the exercise of his independent medical judgment, Dr. Herrington elected not to order transport to an outside facility at the time of

his first examination of Plaintiff, but instead decided to wait until Friday, July 8, 2011 when an x-ray technician would be available at WCI. "[N]ot only does the court not have the expertise to substitute its judgment [for that of medical providers], [but] the pace at which medical decisions have to be routinely made does not lend itself to judicial determinations." *Rowe*, 2010 WL 3779561 at *8 (granting summary judgment to Plaintiff's "class of one" claim that he was provided with disparate medical treatment based upon his status as a transsexual, R&R adopted at 2010 WL 3779437 (W.D. Mich. Sept. 22, 2010).

Of course, the main evidence that Plaintiff offers in support of his equal protection claim is the allegation in his complaint that Nurse McNally responded to his inquiry about Inmate W.H.'s alleged preferential treatment on July by stating: "It's a White thing." For several reasons, McNally's statement is insufficient to support Plaintiff's equal protection claim against Defendants Sassaman and Arnett. First and most importantly, as previously noted by this Court in its adoption of the undersigned's prior R&R, only Sassaman and Arnett were alleged to be the decision makers with regard to whether or not Plaintiff was sent out for x-rays on the night of his injury. Ordinarily, contemporary statements by decision makers is the most probative of discriminatory intent. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977). Defendants have offered unrebutted evidence that McNally was not a decision maker on the evening of July 5, 2011, or, for that matter, regarding the treatment of W.H. (Doc. 54- His alleged statement was made not at the time that Defendants rendered initial treatment, but three days afterward. Of course, McNally has also submitted an unrebutted affidavit denying that he made the statement at all, but in light of the medical

records, prison policy, and other rational bases for the decision offered by Defendants, McNally's statement still would be insufficient to overcome Defendants' motion for summary judgment. *See Umani v. Mich. Dep't of Corrections*, 432 Fed. Appx. 453, 459-460 (6th Cir. 2011)(statement by nondecisionmaker insufficient to satisfy Plaintiff's burden of demonstrating discriminatory animus)(citing *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) and additional Sixth Circuit authority).

### C. Plaintiff's Motion

Plaintiff filed his motion for summary judgment well before the completion of discovery in this case. Plaintiff contends in that motion that he is entitled to judgment based primarily on evidence generated during the exhaustion of his administrative grievance process. That evidence, and additional responsive documents provided by Defendants during written discovery in this litigation, are attached as exhibits to the motion. The undersigned has closely examined all of Plaintiff's exhibits, but for the reasons discussed above, does not find them to be sufficient to grant Plaintiff the requested relief.

### III. Conclusion and Recommendation

Accordingly, **IT IS RECOMMENDED THAT**:

1. Plaintiff's motion for summary judgment (Doc. 46) be **DENIED**;

2. Defendants' cross-motion for summary judgment (Doc. 54) be **GRANTED**;

3. Plaintiff's construed motion to amend the damages portion of his complaint (Doc. 43); Plaintiff's motion to be transported to this court for further proceedings (Doc. 51), and Plaintiff's motion for jury trial (Doc. 55) all be **DENIED AS MOOT**;

4. As all claims have been dismissed and no further matters remain pending, this case should be **CLOSED**.

> *s/Stephanie K. Bowman*
> Stephanie K. Bowman
> United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

MOUSEN ADEN,

        Plaintiff,                                Case No. 1:12-cv-86

      v.                                       Spiegel, J.
                                              Bowman, M.J.

DR. RYAN HERRINGTON, et al.,

        Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).